May it please the Court, I am August Flengey with the Department of Justice here on behalf of the United States. We think the core concept underlying this dispute is straightforward. In the substitution drawback provision, Congress wanted to allow a drawback of duties, taxes, and fees to promote export and allow fair competition between overseas and domestic producers. Thus, an import could be substituted for a comparable export and get the same tax treatment as if the domestically produced product was sold in the United States. But Congress was quite clear in guarding against abuse of this privilege by prohibiting an importer-exporter from counting a drawback twice. Thus, Congress said that merchandise that is exported to satisfy any claim for drawback shall not be the basis for any other of the changes included in your rule and it's resisted that temptation, correct? Congress has not passed anything since 2004 directly relevant to the issue before the Court. And there have been proposals and there was a prior rulemaking that didn't get concluded. But we don't think that tells us anything about what Congress meant in the 2004 amendment and 1313V. Counselor, this is Doug Gerena. Specifically address the Trade Facilitation Act and what it did or did not do with respect to the rule. The TFTEA simplified some of the drawback provisions but did not address this issue at all. And we would submit that plaintiff's reliance on this and some of the discussion by the Court of International Trade was not a reliable source of legislative history. And that when the House report on TIFTA talked about preserving treatment for wine, it was referencing the substitution standards. It was not referring to how double drawback of excise taxes would be treated. Does it say that? Does the act actually say what you just argued? Well, the act doesn't address J2 at all. It addresses a bunch of other provisions. And it does not address the language added in subsection J2 in 2004 that we think gives rise to the current dispute. We think it's the far more relevant history of enactment is to look what happened in 2004. And I think that really tells us why plaintiffs are incorrect on their theory that the 2004 legislation resulted in a dramatic change in the legal landscape with respect to how excise taxes are handled under the substitution drawback system. Going back to the TIFTA, it seems to me that Congress was clear there that the amount of drawback was to be paid was to be equal to the amount of the duties or taxes that would apply to an exported article if the exported article were imported. That seems to be clear, plain language, clear. And that runs contrary to your rule. Sure, Your Honor. I think you're referring to 1313L1. And the lower court talked about this. And the L1 provision, excuse me, the L provision was, you're right, simplified. But we are, we submit that the reason for that was to make clear that you took the lesser value of the possible drawback. So you couldn't... But that's contrary to the language of the statute. You're applying the lesser value concept to something that says it equals the amount of duties that would apply if the exported article were exported. Well, subsection L speaks to how to determine the calculation of amounts refunded as drawback. So subsection L tells you what the drawback amount will be. It does not tell you how to apply the drawback anti-abuse provision in subsection V. And just like subsection J2, subsection L says, here's what counts as the drawback. It tells you what the amount should be. It should be equal to something else. Your rule says that the amount should be less than something else. Isn't that contrary to the language, the plain language of the statute? No, Your Honor. It's not contrary to subsection L or subsection J2. Again, subsection L tells you how to calculate the amount of the drawback. If you have a low-value good and you exchange it for a value with a high duty, you're going to draw back the amount of the low-value good. But that is only the beginning of the process. This is a complicated statutory scheme. Go ahead. Counsel, I haven't, this is Judge Lorry. I haven't heard the word notwithstanding mentioned yet. And your argument appears to be notwithstanding, notwithstanding you should win. But doesn't that provision work against you? Your Honor, I think now we're moving to the right enactment to really focus on, which is the 2004 law, which added that notwithstanding term. It also changed the relevant provision of J2 to say, to refer to taxes imposed upon entry from taxes imposed because of entry. Let me talk about the notwithstanding term. The notwithstanding term was added to explain that irrespective of the type of tax or duty, those sorts of transactions resulted in that being a drawback notwithstanding other law. In other words, notwithstanding how the Internal Revenue Code might define it. That only gets you again to the next question is, what do you do with the drawback? Well, subsection V tells you there's an anti-abuse provision that also limit when that drawback can actually be collected. So we think the notwithstanding provision does not carry the weight that the district court placed on it. The notwithstanding provision ensures that an excise tax is counted as something that could be drawn back. But then you have to look at the anti-abuse provision. Does the anti-abuse provision... Actually, it's the Court of International Trade, not the district court. I'm very sorry, Your Honor. Yes, the Court of International Trade, we think, placed too much weight on that notwithstanding provision, which was designed to define when a tax fee or duty could be subject to drawback, but not to override or override the anti-abuse provision for double drawbacks. And I want to take us back to the history of that 2004 law that we're all discussing here. Well, maybe before you do that, can I add this in? Notwithstanding the notwithstanding word, the provisions that govern drawbacks refer to drawbacks where a tax is paid or determined, right? And you would have us expand that. You tell us that the situation of exportation from a bonded facility without the payment of tax is still a drawback. And I'm not appreciating and understanding what I think is your redefinition of a drawback. So can you help me out with that too? Sure. Sure, Your Honor. The Court of International Trade found that the plain language of the statute only counted certain drawbacks. And we think that was incorrect. And there are a couple of reasons. First, as the Court of International Trade said, the statute doesn't define drawback. It leaves that for the agency to do. And that's what the agency has endeavored to do here. Second, statutes have used the term drawback to refer to exactly what we're an excise tax that doesn't need to be paid because of export. That is the meaning that the agency adopted here, which is straightforward and runs through the trade laws since the beginning of the Republic. Third, the Supreme Court talked about this concept in the Passevant case over 100 years ago. And it talked about the substance of the transaction rather than the specific label given to it. And the substance is, and this is a quote, a device resorted to for enabling a commodity affected by taxes to be exported and sold in the foreign market on the same terms as if it had not been taxed at all, end quote. And the words that used for that were bonification, refund, rebate, remission, bonus, and drawback. This is a well-understood concept that Congress has called a drawback since the beginning of the Republic that Congress in 1313d also calls a drawback, an export where the determined tax is not paid. So we submit that in order to have a consistent meaning of the term drawback, these transactions when a product is exported and therefore excise taxes are not paid, that counts as a drawback. And it's certainly reasonable for the agency to interpret that way. What about claim for drawback? Where's this, it's an odd way, you're talking about categorizing from a bonded facility without the payment of tax is a claim for a drawback. That's your argument, right? Isn't that an odd way to use the word claim? What's the claim? Well, Congress spoke broadly of any claim for drawback, which to suggest that Congress wanted that term interpreted broadly to assure there wasn't abuse. And I want to stress that what's being drawn back if something is exported free of tax, it is the tax liability that would have would have been paid if it had been sold in the United States. And again, that is what Passevant talks about. That's what Congress talked about in 1789. There's nothing uncontroversial. Counsel, so what's being what's being drawn back if there has been nothing paid at all? As I said, it is the liability that would be paid if the product was sold in the United States. It is the drawback of that potential liability or the cancellation of that liability. And again, the IRS, that sounds like a calculation of liability of the tax that would would accrue or would apply if the product was sold in the U.S. Customs Territory. But drawback, it's it's simply what the name infers. You're taking something back. You're refunding something that's been paid. Well, under your definition, you can have a drawback and nothing never having been paid. Yes, we think that's what Congress meant when it said any claim of drawback, it was speaking broadly, it was it was incorporating 200 years of jurisprudence saying that this type of transaction is treated as a drawback. And we certainly think it was reasonable for the agency to interpret that way. When the statute uses drawback in 1313b, when the Judiciary Act of 1789 uses it that way, when the Supreme Court says it uses that way, when the CBP regs in 1999 used it that way. Counselor, are you familiar with the VAT tax? I'm sorry, I'm not. You're not. Okay. It's a value-added tax. Okay. I'm not going to be able to comment on that, but we can address it in supplemental briefing if it would be helpful. I see my time has expired. I would like to save a minute or so for rebuttal, if that's possible. Yes, we will do that. The court has no further questions. Sure, absolutely. Mr. Keisler. Thank you, Your Honor, and may it please the court, Peter Keisler, on behalf of the Appellees. I'd like to begin, if I might, with the questions raised by Chief Judge Prost and Judge Reyna as to what Congress did in Teftia, and also what Judge Lori asked about concerning the notwithstanding clause, because I think what those can't be reconciled either with the text of the governing statutes or with Congress' repeated rejection over the last 16 years of the policy that the rule seeks to impose. So to begin with Teftia, Teftia did three things of relevance here. First, as Judge Reyna said, it established a mandatory calculation methodology in 1313L2, and what L2 says is that the methodology must be 99% of the lesser of either what was paid on the import or what would have been paid on the export if it had been imported, meaning the excise taxes that would have applied to the export were imported. Customs has flouted that principle because what it says instead is it will refuse to refund what was actually paid on the export, but the calculation methodology says that what was actually paid on the export is not the measure. It's what would have been paid had it been imported when there would have been an excise tax applied. But Teftia did two other things of relevance here as well. At the time Teftia was enacted, Customs had been paying substitution drawback on wine for over a decade. No one else among the alcoholic beverage community was able to claim substitution drawback because the standard for substitutability was much different and harder to meet for other beverages, but wine had an easier substitution standard, so it was getting substitution drawback paid. So Teftia did two other things. First, it said in the conference report that the existing treatment of wine would be preserved, and second, it expanded the substitution standard so that for the first time spirits and beer would also be eligible for substitution drawback. Now as to the notwithstanding clause that Judge Lorry mentioned, that was passed in 2004 precisely as Customs admitted below to overrule Customs headquarters decisions which had denied excise tax drawback on alcoholic beverages. And the notwithstanding clause, at a minimum, has to be construed to effectuate the precise purpose for which Customs admits it was added to the statute, which was to overrule Customs' previous denial of excise tax drawback. But the run even further, and that goes to the question Chief Judge Probst asked later on, which is the definition of drawback in the statute. Because the basic essential legal premise of Customs theory here is that every untaxed export of alcoholic beverages itself constitutes a claim for drawback. And that's why they say relying on that export to claim substitution drawback on an import is an impermissible second drawback prohibited by 1313b. But the text doesn't permit that theory because when there's merely an export without payment of tax, there's no drawback and there's no claim. So the two necessary elements of a claim for drawback are both missing. So first of all, as to the meaning of drawback, the term appears in many, many statutes in the U.S. Code and none of them. Can you conclude a response to your friend's argument, which I think he noted a couple times, that this goes back to the 1700s? Well, substitution drawback does not go back to the 1700s. The earliest stages of drawback did begin in 1789. But what we're dealing with here is something that was added in the modern to provide and does provide a tax benefit to those companies which increase their exporting activity because that, Congress believed, encourages manufacturing and encourages jobs. So the ancient history of drawback isn't really relevant here. What is relevant is how, in the modern era, Congress has used that word. And the tax code on this is really very clear because the word appears in lots and lots of provisions and not once does any provision use it the way customs uses it in this rule. As customs, in fact, admits, the only provisions in the code that classify exports as drawback are those that apply to the very small minority of instances in which the excise tax has already been paid or determined prior to exporting. By contrast, the provisions that apply in the normal course to the vast majority of alcoholic beverage exports where they are just removed from the bonded facility directly for export and no tax is ever paid or determined, those provisions never classify the export as drawback at all. And that's because, as Judge Reyna said, for those exports, there is no payment or determination to be drawn back. And the cases from the Supreme Court and this court and other court are legion that say that Congress includes the term in some provisions and excludes it from others. And this applies in particular when you're talking about a specialized legal term of art like drawback. When Congress includes it in some places and omits it in others, then an agency has to respect what Congress has done. And here, customs has done the opposite. It indiscriminately applies the word drawback to every export. And the cases are clear. Mr. Kaiser, can I take you back to the point you were making about notwithstanding? Because government says you can't just interpret notwithstanding to mean the statute overrides literally every other provision of law. And in your brief, I think wisely, you kind of agree with that. And you say everyone agrees that notwithstanding may not be taken to its logical extreme, and that both subsection V and other provisions in section 1313 can appropriately limit substitution drawback. So my question to you is, how do we know then when to draw the line? Yes, well, I think Your Honor has stated it correctly, which is that the cases say that you don't interpret a notwithstanding clause literally to that extreme as if it obliterates every other provision that might apply. So for example, the government says that our reading would mean that doesn't apply to drawback, but 1313N says it applies for purposes of J2. So of course it applies despite the notwithstanding clause. But the two principles that I would urge on the court are first, it has to be given some meaning, and customs gives it no meaning at all. The government hasn't identified a single respect in which it says that the notwithstanding clause limits what the government can do under drawback. So first, it has to have some meaning. And second, at a minimum, it should have a meaning that is in keeping with the specific purpose that Congress enacted it to accomplish. And as customs acknowledged below, here, the notwithstanding clause was enacted specifically to overrule the customs decisions denying excise tax drawback. So the court doesn't need in this case to figure out what the outer limits are, because this lies within the core of the reason it was enacted. But I would also add, Your Honor, that even if the notwithstanding clause didn't exist, it's obviously a very strong argument for us, but even if it didn't exist, the result would be the same, because it would still be customs' burden to justify its definition of drawback to include every export regardless of whether Congress called it drawback or not. And in addition, customs would have to separately demonstrate that an export without payment of tax somehow constitutes a claim for drawback. And as Your Honor pointed out, that is a separate legal issue here, because when there's merely an export without payment of tax, no one is making any claim against the government for anything. And in arguing to the contrary, the only thing the government points to in its brief is its own forms. But there in the appendix, and they prove our point, they track the statutory distinctions between drawback and non-drawback and claims and no claims exactly. The forms that apply to the minority of instances in which tax was already paid or determined, they talk about claims. There's a claim number on that form. They talk about drawback, and they require the person filing the form to certify that it is entitled to drawback in the amount claimed. The other forms, the ones that apply to the vast majority of exports and that operate under the statutory provisions that say where tax hasn't been paid or determined, the good can simply be exported from the bonded facility, and those statutes never use drawback. The forms, likewise, never use the word drawback, never use the word claim, don't assign a claim number, don't require the filer to certify that it is entitled to the amount claimed. So neither is there a claim, nor is there a drawback, not only under the statutes, but under the forms that Customs itself has prepared, because it's only in this rule that Customs, for the first time, Chief Judge Proffitt, you said, redefined the meaning of drawback and added to the regulation for the first time the proposition that drawback includes simply the remission of excise taxes that are not paid on the exports. And in addition to being irreconcilable with the particular textual provisions that govern here, that's just a broader reflection of the fact that Customs policy is irreconcilable with Congress's repeated rejection over the last 16 years. In 2004, when they added the notwithstanding clause, in 2016, when they enacted TIFTIA with its precise calculation methodology, preserving the treatment of wine and expanding the substitution standard so as to enable other alcoholic beverages to enjoy the treatment that wine had enjoyed for over a decade. And we've noted in our brief, and I won't repeat it here, but all the touch points in between 2004 and 2016, where Congress rejected legislation that would have adopted Customs rule, where Customs proposed a rule to accomplish in 2009, what it seeks to accomplish here, and withdrew it in the face of congressional opposition. In all of these instances, I don't know of a case in which there has been a more consistent history with as many touch points over the course of this number of years in which an agency has repeatedly tried to implement a policy and Congress has repeatedly rebuffed it. And Mr. Flangey talked about legislative history. This is not mere legislative history. This is a legislative chronology, which includes affirmative enactments into law in 2004, when the notwithstanding clause was added, and in 2016, when TIFTIA was enacted, which embody that policy. And if the court has no further questions. Hearing none. Thank you, Your Honor. Thank you very much. Mr. Flangey, we reserve, I don't know how much time you had left, but two or three minutes ought to do it, I hope. Sure. I just want to make two quick points on rebuttal. The first has to do with the purpose of the substitution drawback scheme. Counsel on the other side says, well, it's to encourage exports, but it's also to have leveled the playing field, to have these compete fairly. And what they're asking this court to do, and Congress hasn't clearly done it, what they're asking this court to do is to create an excise tax-free zone for imports into the United States of alcohol, of cigarettes, of gasoline. That is not possibly what Congress intended. And that brings me to my second point, which is the 2004 enactment. The other side said repeatedly that was expressly designed to allow excise tax drawbacks, but it wasn't designed to allow double excise tax drawbacks. And in fact, the legislative history of that enactment, which changed two minor things in J2, said very specifically the point of that was to address this court's decision on the harbor maintenance tax. Congress was focused on the harbor maintenance tax. The excise tax is 50 times the size of the harbor maintenance tax, and it's shocking that the legislative history would focus on the harbor maintenance tax, but make no mention of the excise tax. What actually happened was Congress broadened with that notwithstanding clause what could be counted as drawback. Excise taxes are now potentially countable, but it didn't change this anti-abuse provision. It didn't alter the ability of Commerce under 1313V to ensure that drawbacks were counted only once per substitution. That's all that the Commerce Department did here, and a ruling the other way will leave a significant imbalance by allowing excise tax-free imports into the United States, which Congress certainly never addressed specifically, and it should not be addressed now that we have reasonable regulations preventing that. Thanks very much. Thank you. We thank both sides. The case is submitted, and that concludes our proceedings for this morning. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.